Good morning. Good morning. My name is Terry Bowman White and I represent Bobbette Blake in this matter against MJ Optical. I'm sorry I was looking at the case name called you Ms. Blake. Oh I'm sorry. Good morning, that's my mistake. Good morning Ms. White. Well Ms. Blake is here so that is not inappropriate. Ms. Blake's case is a sex harassment and age discrimination case and I'm not going to repeat all the facts for you. They're in the brief but just to set the stage for why we're here I wanted to give you the basic facts. Ms. Blake is now 68 years old. She was a longtime employee in the eyeglass fabrication industry which MJ Optical operates in. For the last 10 to 15 years of her employment ending in grabbed her on the rear end or touched her entire cheek on a regular basis. He also escalated that into lewd comments to her about her breasts. When she approached him at his desk he would say things like, whoa be careful those things are gonna poke my eyes out and it got even worse when he asked her, is it the size of quarters or nickels? After that continued for years and at the very end of her employment during the last year it got even worse. He asked her or said to her, excuse me, the only reason I'm keeping you around Bob is to watch you die. There's not much more that could be specifically age-related than I would like to address the hostile work environment case first and then progress to the constructive discharge issue in reverse order that the district court decided it because I think that has a more logical progression. The district court ignored significant evidence of very severe hostile work environment matters. As you could tell the physical touching was present. Ms. Weakley and that occurred starting in 1999 when her husband died. When he died at the funeral her supervisor was there. Her supervisor Marty Hagee was the owner's son and he came up behind her outside the church while she was standing next to the pastor and grabbed her rear end and she was needless to say very put out and she looked at him and said, why would you do that? And his answer is quite telling. I thought you needed it. Well from 1999 on throughout her employment until May 2013 that occurred and according to her deposition testimony it occurred at least on a weekly basis. She was touched wrongfully or she was made fun of with respect to her body parts. At the end he escalated and included the age claims. Watch you die. And in its brief MJ has tried to kind of recast for the court the mental picture of the MJ workplace and stated in its brief at page 19, Blake conceded that the quote watch you die comment was sometimes made in jest in response to her playful questions of why Marty was keeping her around. In fact in her guts that possible argument. It was not playful. She was asked, did you ask him why are you keeping me around in a joking manner? And Ms. Blake's answer was one word, no. I don't think you can infer playful from no. It all started in 1999 and it continued unabated. The district court also found that there was no evidence that supports that either. Like I just said she wasn't playing around. She wasn't inviting the conduct. In fact she tried to stop the conduct by going out after he made one of those comments about her chest to buy new underwear to make sure he couldn't see things that he was focusing on. But the district court erred when it relied on the Eighth Circuit's case in Stewart versus General Motors. In Stewart, General Motors not surprisingly had an employee handbook, had written policy against discrimination, it had a human resources department, had an HR person on-site. The employees were well aware what their company than General Motors and most employee players are smaller. But MJ had no employee handbook, it had no written policies, it didn't have an HR department. So in order for Ms. Blake to report this conduct to someone in management she would have had to do one of two things, both of which I think you will agree were futile. First of all she would have had to report to a supervisor. Who was the supervisor? The perpetrator of the bad acts. Marty well knew what he was doing when he was grabbing her on the rear end and touching her, excuse me, and commenting about her breasts and her nipples. He knew Title VII's not brand new, it's been in place for decades. It's well known what is and is not acceptable. Either Ms. Blake would have had to report this conduct to Marty, a futile effort, or she would have had to report it to the company president above Marty. Well who was the company president? Marty's mom. Marty's mom wasn't even at the office or at the facility every single day of the week and she was only there a couple hours a day. So catching her would be by happenstance, but in the past when employees, not necessarily Mrs. Blake, had reported her son's conduct to her on any type of issue, the response from Mrs. Blake, excuse me, Mrs. Hagee was, oh my boys wouldn't do anything like that. So that was what she was up against. She could report it to the perpetrator who would not accept that her boys could do anything wrong. Ultimately, after this long pattern of conduct, years, actually it was 747 weeks, every week, every year, every month, ongoing pattern of this nasty physical conduct and comments. What about the comment, the court argued by the defendant here, is that Mrs. Blake said that she wasn't treated any different than other people. Marty was . . . I don't know what the word is. Improper conduct or said things to everybody. Well, two things. First of all, I think being an equal opportunity harasser or an equal opportunity discriminator does not change the fact that the conduct is wrong. So, and the second thing is that Ms. Blake's personal perception of what was going on or what happened, actually I think that was in reference to the event that led to her constructive discharge. Marty came at her because of an eyeglass sort of problem and he came at her across the room and she, he was sweating and red in the face and chewing on his tongue and he said to her, stop that, don't do that, sit down, do nothing. And he did not carve up all of these incidents into single events and the law in this circuit is clear, you consider the entire employment process. And not only that, but when there is a pattern of behavior that comes to a one final event that may not necessarily specifically address sex or age, then the court can infer that that last step was actually gender-based as well. The Second Circuit case that I cited in the brief is specific to that. How can you tie the firing, a constructive discharge, when your client says, well it was the anger, it was the yelling and so forth, that's why I quit. Is adverse employment action based on, I mean they didn't want him, they weren't asking her to leave. Why do you say that's adverse employment action based on age or sex? Well like I said, we cannot carve up the various events into discrete items. They have to be, it was a pattern of conduct. And the adverse impact, I mean the test is whether or not they intended her to leave or whether or not it was reasonably foreseeable that an employee would leave. I can see that falls under hostile work environment, that constructive discharge. I'm just trying to see if you're also saying her leaving was on the basis of sex or age. I believe that it was and we believe that there's support for that in the cases. Not only, I mean there'd been this pattern, it's not the arrestor type of case where there was a one-time blow-up and the employee was mad about that. There had been a year all along, there had been a decade long pattern of conduct that resulted in her being, I just can't deal with this anymore, I have to go. And that was when Marty's mom said to her, you go home, you just go plant some flowers. Her claims weren't being taken seriously, there was no question about that. What does the record show about the structure of the company, the management of the company? The lawsuit is against the corporation. Correct. How many people made up this organization? What was the management? I'm thinking about this issue of, as you allege, whether notice or complaint to management was truly futile. What are the facts? In three minutes for rebuttal time, if I could, but I'll answer your question. The company president was Marty's mom. There was a layer of management under her and that was supervisors of the various areas. And her son, Marty, was one of those supervisors and he reported directly to his mom. There is also a board of directors and Marty was on the board of directors. He was a director as well. So how many people were employed in the company? I am not certain, but it was not a big company like GM. It is a relatively small employment employer in the industry. Less than a hundred? I believe so. Okay, if you want to save a little time, you can. Thank you. Good morning again. Good morning again. May it please the court, counsel. My name is Catherine Dittrich Huebner and on this case I'm here representing the defendant and appellee MJ Optical. The plaintiff in this case voluntarily resigned for reasons that are not actionable and are completely unrelated to her current claims. Her claims of gender and age discrimination are wholly contrived by her attorney and not supported by her own testimony. For example, the plaintiff blatantly admits, as Justice Riley stated, that she was not treated any differently because of her gender. That's on page 74 of the appendix. She has asked if she felt she is treated differently because of her gender, because she's a Summary judgment was proper in this case. There is no dispute of facts. There is no dispute about the applicable legal standards of the case. The parties just differ on the application of the law to the facts. What did that question mean? Pardon me? What was the question that she was asked? About whether she feels she was treated differently? Whether she was treated differently. Sure. She is treated differently because of your gender, because you are a woman. The response, no. Now what do you think that question means? That whether or not she felt that the treatment of her was based on the fact that she was a woman and whether or not he treated other females in the same fashion. Was it a question directed at these kinds of comments and physical touching or was it a question related at, for example, compensation benefits of employment? The former, I believe, Your Honor. I did not ask her about compensation or benefits. I'm just pointing out that that kind of question's got several layers to it. It seems to me that obviously, by her testimony about these events, she is contending and did contend that she was treated differently. She believes, I would agree that she believes she was treated differently but not because of her gender. There was no evidence presented that he targeted women or treated women differently than he treated men. Well, is there evidence that he touched men? That he made comments about the physical anatomy of the men employees? No. There is no evidence of that either. I just point out, it seems to me that's maybe one of your weaker arguments. Is that she was... That this is some kind of recently contrived recollection about actions taken against her by this individual. Well, when you look at the totality of the circumstances, Your Honor, I think that addresses that and makes it clear that this was not based on gender. It was the nature of their relationship. They had known each other for nearly 40 years and the defendant in this case produced some evidence just describing the nature of their relationship. For example, the plaintiff attended the wedding of Marty's daughter. Her grandson attended college courses with Marty and Marty assisted him in his coursework. Marty lent his hog cooker to her church and she introduced him to his pastor. They had a relationship that she reasoned why he acted in the manner that he did, although unprofessional and boorish, was not because of her gender but because they had a close relationship. On the discrimination claims, there's no question that under the McDonnell-Douglas test, to establish a prima facie case, she has to show an adverse employment action. There's no question that she resigned. She states that she was not alleging that she was constructively discharged. In order to establish that claim, she has to show that a reasonable person in her situation would find the working conditions intolerable and that the employer intended to force her to quit. Here, the intolerable conditions that she describes are not the reasons for her resignation. They're completely separate. Plaintiff's counsel talks about the fact that you can't divide them, but there has to be some sort of connection in between the sexual conduct and the reasons for the final incident that caused her resignation. The facts are most similar to the case of Ruster versus Stevens media that the Eighth Circuit looked at, where there was an angry outburst by a supervisor. In that case, he physically battered the plaintiff three times. He pushed her into the chair. The court found summary judgment in that case, saying that there was no evidence of any relation between sex-based conduct or gender-based conduct and that final altercation. Here, the ultimate circumstance that caused her to resign was much more benign than it was in the Ruster case. The plaintiff worked as a bench technician for MJ Optical. Her job was to fit lenses into frames. There was a time period where there were a significant number of frames that were coming out broken. The plaintiff herself took those frames to the president of the company, Mary Hagee, and told her about the problem. Mary told Marty, who was in charge of the department, to figure out what was going on with these frames. So Marty began to troubleshoot. He needed to figure out if it was the machine that was causing the problem or plaintiff, the machine operator, who was causing the problem. So he had other employees come in and work the machine to see if the problem was still going on. There were other things that plaintiff could do. She admits that. She admits that she was not demoted. She was not disciplined. But tensions were high for everyone because they had to figure out what was going on with these frames. Plaintiff describes an incident when she took it upon herself one morning to just start working back on her machine. And she describes Marty blowing up about that. She says he came toward her and saying, get off that machine. Don't do that. She testified that she was scared. She was crying. She reported the incident to another supervisor and reported it to the company president, to Mary Hagee. Then, without giving her any time, Mary Hagee, any time to resolve the issue, she called the next morning and resigned. She said in her resignation that she was resigning due to Marty's anger issues and that she thanked Mary for being a good boss. These are the facts of how her employment ended, according to the plaintiff. On page 79 of the appendix, she specifically asked what caused her to resign. Her answer is, I knew there was nothing that was going to be done about the problem. I asked, the problem of Marty, of him raging at you, or, and she says, that and the way the work was coming out, I knew it was never going to be fixed. I said, you mean the problem with the frames when you say the way the work was coming out? She says, frames and lenses both. She makes very clear that that is the reason for her resignation. I then go through her allegations of sex and age-based harassment and ask if the resignation had anything to do with those allegations. She says, nope. That was her answer. Again, that's on page 79 of the appendix. She cannot assert that her working conditions were so intolerable because of age and sex-based harassment while admitting that she resigned for completely separate reasons. Most importantly, the Eighth Circuit has consistently held that an employee who fails to give their employer reasonable, a reasonable opportunity to rectify a complaint cannot be constructively discharged. That's the Trier Wheeler versus Wells Fargo Bank. Another case, Tidewell versus Meyers Bakeries. Brenneman versus Famous Dave's. Ames versus Nationwide Mutual Insurance Company. All of those cases hold the same proposition that you have to give your employer a reasonable opportunity to correct the problem, the complaint. She did not do that in this case. There's no question that she resigned the next day without giving them any significant time. Since she cannot claim constructive discharge or show any other adverse action, her Now, on the harassment claims, for either claim, for sex or ... Did you cover in the depositions why she didn't go ... I can understand why she wouldn't go to Martin, but go to the owner, his mother, or go to somebody and complain from 1999 on about ... I did, Your Honor, and her response to that was that it would be futile, that her boss wouldn't do anything about it, that the president of the company wouldn't do anything about it. But that is contradictory to the fact that she did complain to Mary about another issue. So she clearly shows that she knew who to report to and that she felt perhaps that something would be done because she did complain to Mary about the outburst that Marty had on the lenses in the frame issue. How big a Your Honor, when you were asking that of plaintiff's counsel, I do not know the exact number, but I do know it's less than 50 employees. So it is a small family-run business. Regarding her harassment claims, she has to show the conduct was unwelcome, that it was offensive, that it was sufficiently severe and pervasive as to alter the terms and conditions of her employment. And she simply cannot meet that standard under the applicable Eighth Requires extreme conduct rather than merely rude or unpleasant conduct and the court must assess the totality of the circumstances here. As plaintiff's counsel described, she states that there was a comment from Marty that her hands aren't good anymore. That's in the context of her asking Marty for assistance in performing certain tasks that she was unable to do due to weakness in her hands. And there's no adverse action there. Marty simply helped her. He jumped in and said, sure, I can do this for you. She also makes an allegation that Marty said that he was keeping her around to watch her die. And I would pose that that's actually the opposite of discrimination. You're not saying I'm gonna fire you because of your age. He's saying I'm gonna keep you here forever. Plaintiff's counsel also misconstrues that testimony and does not accurately because she does in fact admit that that was said in jest. I ask her, this is on page 73 of the appendix, I say, were you asking that in a joking manner? And she says, no. Then I ask, did you think that his response was in a joking manner? She says, I don't know. I said, okay. And then she says, it all depends on the day. I say, okay, so you think sometimes he was joking with you? She says, sometimes. That's the testimony from plaintiff. Now she has allegations that he did pat her on the bottom. There is a dispute of fact on that about the frequency and whether or not she reciprocated the conduct. But defendants understand that on summary judgment you are required to take the facts as she alleges them as true. And she does admit though that she occasionally touched Marty on his back between his shoulders. Regarding the comments about her breasts, it's unclear when that comment occurred or the frequency of it. But she states that she responded by going out to purchase a padded bra. And we can assume that she would not go out and do that multiple times so that that was a one-time comment regarding her breasts. Again, the defendant is not disputing these facts. And it's admittedly unprofessional and a boorish comment, but it simply does not rise to the level of harassment under Eighth Circuit precedent. In the case of Rickard versus Swedish Match, the court makes clear, the Eighth Circuit makes clear that behavior that is inappropriate or obnoxious is not indicative of sex-based harassment if the employee cannot show that the alleged harasser harbored hostility toward women or pursued sexual gratification. And neither of those circumstances were the case here. Again, plaintiffs describe their relationship as close. They've known each other for nearly 40 years and there are examples to describe their relationship, which I discussed earlier. Furthermore, there's no evidence that the conduct was unwelcome. Her failure to report is, in fact, evidence that it was not unwelcome. Plaintiff goes into detail about the Ellert-Farger defense in her brief. However, I don't believe we get to that assessment yet because my understanding of the law is that that defense comes into play if there is harassing conduct to start with. And we're contesting that there was not harassing conduct to start with from the beginning. Importantly, the plaintiff, not only did she not report, but she never even told Marty to stop. She never said cut it out or stop it. She simply did nothing. Again, her actions were the opposite of that. She admitted that she and Marty would say I love you to each other and that they had a close relationship. Based on those facts, we believe that she can't meet her harassment in this case. Unless there are questions, Your Honor, I thank you for your time today. Okay, thank you. Ms. White, you have some time left. For the bulk of MJ's argument, there is a constant theme. Ms. Blake personally did not answer the deposition questions as she personally believed X, Y, or Z happened because of her gender, because of her age. That's not the test. The test is whether or not a reasonable person would find that these comments were offensive or that the touching actually occurred. And her personal opinion about the last event, which I think that her testimony can be attributed to, is not In fact, I think what is very telling is a quote from the District of Kansas court, which did involve touching, and which this court has previously held that touching, coupled with a couple of other lewd comments or obscenities over time, is sufficient to state a workplace harassment claim. The court in Kansas, the a slap on the buttocks in the office setting has yet to replace the handshake, and the court is confident that such conduct, when directed from a man to a woman, occurs precisely only because of the party's respective gender. It didn't have to be explicit. I'm doing this because you're a woman. That's why he was doing it, and the Kansas court recognized that. There's also evidence... I think that was in the context of stating a claim, and I think you've stated a claim, but we're on summary judgment, which is looking at the bigger picture. I understand, but I think that comment is still very telling about what conduct is or is not acceptable, and it's not disputed that that conduct occurred. I don't think anybody disputes that. Okay. Ms. Blake, like I started to say, there is evidence in the record that he did... Marty did treat others with hostility. For instance, with respect to her direct supervisor, Denise Merriman, there is evidence in the record that he got so angry with her one time, he punched a file cabinet and left his fist imprint in the cabinet. So she was treated... he did treat women with disdain. I think that can only be the conclusion that's reached, and in fact, the nature of the relationship, whether or not they were old family friends or new acquaintances, this type of conduct is not excused. And final, if I could close. Do it quickly. Thank you. We would just submit that the facts and the legal analysis by the district court is should be reversed. Thank you. Okay, thank you both for your arguments today. We're all done, and we will take it under advisement and be back to you as soon as we can. Thank you.